# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI

CARBOLINE GLOBAL INC.,

               Plaintiff,

vs.

THE SHERWIN-WILLIAMS COMPANY,

               Defendant.

Case No. _____

**JURY TRIAL DEMANDED**

## COMPLAINT UNDER THE LANHAM ACT FOR FALSE ADVERTISING

Plaintiff Carboline Global, Inc. ("Carboline") brings this Complaint against Defendant The Sherwin-Williams Company ("Sherwin-Williams") under the Lanham Act, 15 U.S.C. §§ 1051, et seq., for false advertising.

## INTRODUCTION

1.    As fire dangers in modern buildings continue to rise, the need for effective fireproofing systems that protect lives and property has never been greater. Sherwin-Williams—the largest paint company in the world—claimed from 2021 to 2024 that its FIRETEX FX9502 intumescent coating (a fireproofing coating that expands in heat to protect steel) could provide the same life-saving protection as rival products with far less material, labor, and cost. Armed with these eye-popping claims, Sherwin-Williams' FX9502 dominated the intumescent coating market, winning project after project to millions in sales. FX9502 thus spread rapidly into buildings nationwide, fueled by Sherwin-Williams' cost-saving claims and reliance on purported test data.

2.    Sherwin-Williams had a great story, but it was built on falsehoods. Sherwin-Williams backed its bold claims with what it described as third-party testing data about the coating's required thickness (known in the industry as dry film thickness). But unbeknownst to

- 1 -

customers (and to competitor Carboline), the third-party test results Sherwin-Williams was using for FX9502 were wrong.  In reality, the required thickness for the most common applications was *more than double* what Sherwin-Williams had advertised, leaving buildings across the country without the level of fire protection that Americans expect and need.  Sherwin-Williams knew, or should have known, that the third-party test results were wrong but preferred profit over safety and the truth.

3.      Sherwin-Williams could have taken responsibility and compensated competitors like Carboline for the impact of its false advertising.  It did not.  Instead, Sherwin-Williams *threatened* Carboline that *if* it brought this issue to public light through litigation, Sherwin-Williams could attempt to identify and raise an issue with *Carboline's* advertising.  Carboline is undeterred by this meritless coercion attempt by a much larger organization. Carboline sues to hold Sherwin-Williams responsible for its willing false advertising that has harmed competitors, delayed construction projects, and (worst of all) risked the safety of buildings and their occupants with highly deficient fire protection.

4.      Founded in 1947, Carboline is a St. Louis-based coatings manufacturer that is known for producing high-quality performance coatings, linings, and fireproofing products for construction throughout the world.  Prior to 2021, Carboline was an established leader in intumescent coating, including by selling its industry-leading Thermo-Lag E100 product.

5.      Intumescent coatings like Thermo-Lag E100 and FX9502 are critical safety products.  They form an insulating char when exposed to high heat, buying valuable time for steel structures in a fire.  In practice, the effectiveness of these coatings is measured by how much thickness is needed to achieve a given fire-resistance rating.  If builders or contractors neglect to apply the proper intumescent coating thicknesses where required, or apply them incorrectly, the

building can fail to meet safety codes and put lives and property at risk. Thus, ensuring that intumescent coatings are properly specified, applied, and inspected is not only a matter of code compliance but a fundamental safeguard for public safety.

6. Before FX9502 hit the market, Carboline's Thermo-Lag E100 offered highly competitive thickness requirements and reliable performance. But once Sherwin-Williams unleashed its marketing for FX9502, Carboline found itself playing defense. Sherwin-Williams portrayed FX9502 as *far more* efficient because it needed *far less* coating to get the same protection. Citing testing from third-party Intertek, Sherwin-Williams promised thinner layers of fireproofing, which meant, among other substantial benefits, less material equating to lower material costs, faster application, lower labor costs, lower transportation costs, and lower steel erection costs. In competitive bids for fireproofing work, Sherwin-Williams touted the lower installed thickness of FX9502 as a way to save time and money.

7. Sherwin-Williams was not shy about marketing the cost and time savings that customers could achieve by using the lower promised thicknesses of FX9502. It highlighted in advertising that the FX9502 "coating can be applied at a lower thickness than competitive epoxy intumescents, reducing material and associated labor costs." It also promised that "steel can be fire protected in just one working day." In sum, Sherwin-Williams communicated to customers that they could "save hours, labor, and costs" due to the lower thicknesses.

8. Sherwin-Williams also released case studies to convince customers that the substantially lower thickness requirements meant real benefits on projects. For example, it promoted a case study on the use of FX9502 in constructing a 15-story, 112-unit apartment complex in Seattle, Washington. Sherwin-Williams was eager in promoting, touting, and advertising that the beneficial "economies that Firetex FX9502 offered," such as "reduced dry film

- 3 -

thickness (DFT)," helped "seal[] the deal" on the project.  And because "[a]pplicators were able to apply fewer coats of Firetex FX9502," "the steel moved through the shop faster – also translating to lower labor costs."  Unaware of the false coating thicknesses pushed by Sherwin-Williams that created these lower costs, the customer remarked about the construction project: "'We're proud Sherwin-Williams is part of it.'"

9.      In 2024, the truth finally caught up with Sherwin-Williams' false advertising.  That year, Intertek released a new report that more than doubled the thickness requirements for FX9502's fire-resistance ratings for the most common projects.  Indeed, for sufficient fire protection for 2 hours for restrained beams (the most common use), the thickness needed for protection increased by between *102%* and *163%*.  Neither Sherwin-Williams nor Intertek have ever explained why the initial results were so wrong, nor why Sherwin-Williams peddled bad data for years.

10.     After the truth came out, the very foundation of Sherwin-Williams' marketing collapsed overnight.  The "miracle" coating that was supposed to be so thin and efficient turned out to require thickness on par with competing products.  FX9502 was not a game changer.  It was just another intumescent coating, one that provided no substantial savings once the correct data came to light.  And this revelation vindicated what Carboline feared: absent some unknown significant technological advance, Sherwin-Williams' claims were too good to be true.  On an even more serious note, it means that buildings throughout the country coated with FX9502 are at risk due to deficient fire protection and need to be recoated immediately.

11.     Sherwin-Williams claims that it had no idea, and could not have had any idea, that the Intertek results were wrong.  That is not credible.  Sherwin-Williams' predecessor product to FX9502 was FX9500.  Sherwin-Williams had tested FX9500 for thickness requirements with

Intertek and marketed those requirements.  When the FX9502 testing came out in 2021, the thickness requirements were *far lower* than FX9500.  But Sherwin-Williams knew that there was no technological innovation that could explain why the thickness was so much lower for FX9502 than the predecessor FX9500.  Yet Sherwin-Williams marketed those lower thicknesses without, upon information and belief, any internal verification or pretesting (which is common in the industry).

12.    Plus, the corrected 2024 thicknesses put an end to any argument that Sherwin-Williams is innocent.  As shown by **Figure 1** below, the corrected 2024 thicknesses for FX9502 were substantially similar to FX9500, revealing that there was no technological innovation that reduced thickness requirements.  The truth is that Sherwin-Williams knew, or definitely should have known, that the 2021 results were flawed at the time but concluded that the marketing advantage was too good to pass up.

### Figure 1



13.     The consequences for Carboline were devastating.  From 2021 to 2024, FX9502 siphoned away one major project after another.  In an industry where trust and verified performance are everything, Sherwin-Williams' flashy claims gave it an unfair edge and made Carboline look like it could not innovate.  Carboline watched as long-time customers were wooed by the promise of doing more with less.  As a result, Carboline lost contract after contract that it would have won otherwise with fair competition.  Indeed, over the span of just these few years, Carboline's lost sales piled up into hundreds of millions of dollars.  Carboline has slowly begun to recover its market share and rebuild its reputation after the truth about FX9502 was revealed, but it is clear that the effects of Sherwin-Williams' false advertising will long leave scars on Carboline's intumescent coating business.

14.     Carboline does not hastily pursue legal action, and highly respects fair and honest competition.  But when it raised the effect of Sherwin-Williams' false advertising on its business and sought fair compensation, Sherwin-Williams' response was not contrition, but aggression.  It threatened Carboline, trying to distract from this serious issue and silence it.  Carboline is here to tell the full story, to recover the losses it suffered, and to prevent Sherwin-Williams from profiting from its falsehoods.  Carboline asks for a simple but vital outcome: that Sherwin-Williams finally be held to account for the false advertising that gave it an undeserved advantage for years and created a serious fire safety risk to many buildings and citizens occupying them.

## PARTIES

15.     Plaintiff Carboline is a Delaware corporation with its principal place of business at 2150 Schuetz Road, St. Louis, Missouri 63146.  Carboline is the leading U.S. manufacturer of high-performance industrial coatings, linings and fireproofing products that protect steel and concrete substrates from corrosion and fire damage.  Among Carboline's top products are its epoxy

- 6 -

primers and finishes, high-performance tank linings, and intumescent coatings.

16.     Defendant Sherwin-Williams is an Ohio corporation with its principal place of business at 101 W. Prospect Avenue, Cleveland, Ohio 44115.  It is a publicly traded company.

## JURISDICTION AND VENUE

17.     This is an action for false advertising under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

18.     This Court has subject matter jurisdiction because the case arises under federal law (the Lanham Act) pursuant to 28 U.S.C. §§ 1331 and 1338 and 15 U.S.C. § 1121(a).

19.     Personal jurisdiction over Sherwin-Williams is proper because Sherwin-Williams has engaged in substantial activities in the State of Missouri relating to the allegations and claims in this case.  Sherwin-Williams has marketed, promoted, advertised, and displayed the false statements-at-issue in this case about FX9502 to customers in Missouri, including, upon information and belief, for projects in Missouri.  Sherwin-Williams also targets Missouri residents and businesses through its national advertising campaigns, websites, and digital marketing, including search engine results, which are accessible and directed to consumers in this District.

20.     Sherwin-Williams has also purposefully availed itself of the privilege of conducting business in the State of Missouri and in this District.  Sherwin-Williams has numerous physical stores in Missouri, including multiple stores in St. Louis, as well as stores in Kansas City, Springfield, Independence, Jefferson City, O'Fallon, and Joplin.  Through its operation of online platforms, including its website, Sherwin-Williams markets, displays, and sells its products to consumers located in this District.  Upon information and belief, Sherwin-Williams also partners with third parties located in Missouri to promote and sell its products.  In addition, Sherwin-Williams' false advertising has targeted Carboline (as one of the primary competitors mentioned

in its marketing statements), which is headquartered in St. Louis, Missouri. Carboline has suffered reputational and commercial injury in this District. Accordingly, Sherwin-Williams has sufficient minimum contacts with this forum such that it should reasonably and fairly anticipate being haled into court here.

21.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District, including Sherwin-Williams' dissemination of false and misleading advertising and the resulting harm to Carboline's business, which is based in St. Louis.

<b><u>BACKGROUND FACTS</u></b>

**A.      <u>Proper Intumescent Coating is Critical to Limit the Effects of Fires</u>**

22.     Intumescent coating is a special fire-resistant coating applied to construction materials to enhance fire safety. Under normal conditions, the intumescent coating looks like ordinary paint. But during a fire, it transforms to perform a critical safety function that helps protect steel from critical damage (as shown in **Figure 2** below):

<b><u>Figure 2</u></b>



23.     Specifically, when exposed to extreme heat or flames, the coating undergoes a chemical reaction and expands into a thick, foam-like layer. The expansion can increase the coating's thickness many times over (often swelling to dozens of times its original size) and forms

a charred, insulating barrier that shields the underlying material from fire. In effect, the coating "intumesces" (swells up) in high temperatures, creating a protective layer that slows the spread of flames and heat on the surface. To visualize this process, **Figure 3** below shows how the coating looks before a fire (looks like paint), during a fire (becomes a foam-like layer), and after a fire (becomes a charred layer):

**Figure 3**



24.     This protective layer helps prevent fire damage by slowing the transfer of heat to the underlying beam, column, wood, or other substrate. By keeping the structural material cooler for longer, the intumescent coating delays the material from reaching failure temperatures, which can prevent or postpone structural collapse.

25.     In practical terms, this added time can be lifesaving. It gives occupants more time to evacuate and firefighters more time to control the blaze before the structure is compromised. Thus, the coating serves as a passive but crucial fire protection measure, buying time and limiting damage when every minute counts.

26.     Due to the life-saving benefits, intumescent coatings are widely used in

construction to protect key building components from fire.  A common application is on structural steel beams and columns, which can lose strength rapidly when exposed to high temperatures. Building codes often require that steel frames in commercial buildings resist fire for a certain duration (such as one or two hours), and applying an intumescent coating is a proven way to achieve this fire-resistance rating without encasing the steel in bulky materials.

27.     These coatings are also used on other materials.  For example, wooden structural elements or decorative woodwork can be coated to meet fire safety standards while preserving their appearance.

28.     Because intumescent coatings go on thin and look like regular paint, they are especially useful in projects where the structural or design elements remain exposed (for aesthetic or functional reasons) but still need to be fire-protected.  Therefore, the coatings allow builders to satisfy fire code requirements without compromising the building's design or integrity.  And so, due to their look and function, people use intumescent coatings in a variety of buildings: from industrial facilities to modern architectural designs.

29.     For an intumescent coating to perform properly, it must be applied at the correct thickness as specified by its manufacturer and the project's fire safety design.  The required thickness is typically determined through testing and corresponds to the level of fire resistance needed.  For example, a thicker application may be required for a 2-hour rating than for a 1-hour rating.

30.     Building regulations and safety standards emphasize proper thickness verification. If the coating layer is too thin, it will not form a sufficient protective char, allowing the underlying material to heat up too quickly in a fire.  Inspectors often measure the dry film thickness of the coating and compare it to the approved specifications.

31.     Getting the thickness wrong can lead to failed fire inspections, voided certifications, or (the worst-case scenario) a coating that doesn't perform in an actual fire.  Therefore, ensuring the intumescent coating is applied to the correct thickness is critical for both safety and compliance.

32.     Therefore, companies that sell intumescent coatings conduct pretesting of their products during and after development to decipher what thicknesses are required for sufficient protection.  Indeed, if an intumescent coating product required extremely high thicknesses (as compared to competitors), it would not be commercially viable and so it would not make sense to complete development, marketing, and release of the product.

33.     After pretesting, companies submit their intumescent coatings for third-party testing by independent labs like UL Solutions ("UL") and Intertek.  In these tests, the intumescent coating is applied to a steel beam or column and subjected to a controlled fire in a furnace according to standardized fire test methods (typically ASTM E119 or its UL equivalent UL 263).  The fire test simulates a real building fire and measures how long the coated steel can withstand intense heat without failing.

34.     If the coating successfully protects the steel (for example, for a one-hour or two-hour rating), the lab will issue a certification or listing confirming that the product, when applied at the tested thickness, achieved that fire-resistance rating under the standard conditions.  This certified "listing" typically references the test standard (ASTM E119/UL 263).

35.     A successful UL or Intertek test program permits the manufacturer to label its product as "UL Classified" or "Intertek Listed" for a certain fire-resistance rating.  Using these labels with intumescent coating products assures inspectors, builders, and end-users that the manufacturer has demonstrated a commitment to safety and compliance.

**B.      Carboline Led the Pre-Erection Intumescent Coating Market with Its Thermo-Lag E100**

36.     In early 2021, the intumescent fireproofing market included several manufacturers, led by Carboline.  Each of these companies offered well-known intumescent coating products, including Carboline's Thermo-Lag E100 (**Figure 4**).

**Figure 4**



37.     These coatings were designed to swell into an insulating char when exposed to high heat.  And they had to be certified under standard fire tests to meet building code fire-resistance ratings (typically one to three hours of protection).

38.     Competitors differentiated their intumescent coatings by their formulations and performance features, which affected where and how each product could be used.  For example, some offerings were water-based intumescent coatings intended for interior applications.  They had low odor and VOC content and a smooth, paint-like finish, but they may be sensitive to moisture during curing and generally required dry conditions (they were not ideal for use outdoors without protective topcoats).  In contrast, other products were epoxy-based intumescents that delivered high durability and could be applied in thick layers.  These epoxies were often rated for

exterior exposure and could even be applied off-site (in a shop) thanks to fast curing and hardness once dry.

39.    Carboline's Thermo-Lag E100 is an epoxy intumescent that led the market in early 2021 for shop applications.  It stood out as a high-performance, dependable product with several clear advantages over its competitors.

    a.    Thermo-Lag E100 could be applied very quickly.  Contractors were able to build up the full specified thickness in as little as one to two days, whereas a typical water-based intumescent might require up to five or six days of repeated coats and drying time to reach the same thickness.

    b.    Thermo-Lag E100 also provided a hard, durable finish without requiring any fiberglass mesh reinforcement, even for achieving 2-hour or 3-hour fire ratings. This was a significant improvement over older systems that did need mesh for stability.

    c.    Thermo-Lag E100 is also inherently ductile (flexible), robust, and has proven performance.  The ability to maintain linear elastic behavior is critical for epoxy intumescents that are subject to strain from temperature, shipping, handling, and erection.  Products that exhibit brittle behavior are prone to fracture strain leading to unquantifiable repairs post erection.  Thermo-Lag E-100 does *not* have that common issue, reducing long-term repair costs for customers.

    d.    In terms of compliance, Thermo-Lag E100 met all the relevant fire-test standards.  For example, it was certified for up to 3 hours of fire resistance in the standard cellulosic fire tests (ASTM E119 / UL 263).  It additionally earned a UL 1709 certification for the more extreme hydrocarbon fire scenario,

- 13 -

demonstrating effectiveness in petrochemical-type fire conditions. It also passed rigorous environmental durability testing and received a Class I-A rating in UL's 2431 program, meaning it was approved for both interior and exterior use after exposure tests (i.e., it can withstand weather exposure without compromising performance).

40. Due to these advantages—as well as Carboline's industry-leading reputation—Thermo-Lag E100, as of 2021, had become the market leader for construction companies seeking pre-erection, epoxy-based intumescent coatings.

### C. Sherwin-Williams Markets FX9502 as a Superior Solution Due to Cost

41. In 2021, Sherwin-Williams introduced its FIRETEX FX9502 intumescent fireproofing product (**Figure 5**). It specifically positioned FX9502 as a new solution for commercial construction projects such as high-rise buildings, stadiums, airports, and other large-scale structures. And it said that FX9502 was a mesh-free, 100% solids epoxy, and durable enough for shop or field application, which set it apart from older cementitious fireproofing products.

### Figure 5



42. To differentiate FX9502 from competitors, Sherwin-Williams focused on *cost* and *time* savings. In supporting its launch, Sherwin-Williams published results from Intertek showing

the required thicknesses of FX9502.[1]   These results demonstrated that, for restrained beams requiring two hours of protection (of the common application for real-world projects), FX9502 required far less thickness than competing coatings.

43.     For example, the required dry film thickness for FX9502 was typically only a few millimeters to achieve two hours of fire resistance, while alternative intumescent products required several times more material.   Indeed, as shown by **Figure 6** below, compared to Sherwin-Williams' *own* prior FX9500 product,[2] the FX9502 was a game changer, offering *far lower* thicknesses for the same protection:

**<u>Figure 6</u>**



Restrained beam thickness comparison for 120 minutes fire-resistance rating

---

[1] *See* Exhibit A (2021 Intertek Results for FX9502).
[2] *See* Exhibit B (2018 Intertek Results for FX9500).

44.     By reducing the necessary coating thickness, Sherwin-Williams claimed that its product could save both labor and materials while still meeting required fire safety standards.  It disseminated these Intertek results to customers, including on its website and when marketing FX9502 for projects.   And unsurprisingly, Sherwin-Williams *repeatedly* marketed the cost advantages of FX9502 based on these lower thicknesses.

45.     For example, in the *title* of its May 26, 2021, press release announcing the release of FX9502,[3] Sherwin-Williams touted the fact that FX9502 "delivers efficiencies" by "offer[ing] time, labor, and cost savings with lower thicknesses, reduced coats, and fast drying times."  The press release continued by repeatedly focusing on cost and time savings:

(i) "an array of efficiencies";

(ii) "save hours, labor and costs through a combination of low application thicknesses, reduced coats and exceptionally fast drying times";

(iii) "easier to apply compared to competitive epoxy fireproofing coatings";

(iv) "'With faster applications and handling times, FIRETEX FX9502 gives applicators, general contractors and building owners the ability to keep construction projects moving without delay'";

(v) "FIRETEX FX9502 offers some of the lowest competitive thicknesses in the ASTM E119 designs for fire ratings up to three hours";

(vi) "time, labor and cost savings";

(vii) "coating can be applied at a lower thickness than competitive epoxy intumescents,

---

[3] Sherwin-Williams Protective & Marine, *FIRETEX® FX9502 Provides Critical Fire Protection While Adding Corrosion Protection* (June 3, 2021), available at https://industrial.sherwin-williams.com/na/us/en/protective-marine/media-center/news/firetex-9502-cellulosic-fire-protection-corrosion-protection.html.

reducing material and associated labor costs"

(viii) "steel can be fire protected in just one working day"; and

(ix) "efficiencies deliver real benefits to applicators, who rely on fast turnarounds and throughput."

46.     Upon information and belief, Sherwin-Williams repeated the above claims about FX9502 in direct communication with customers, including over email, on phone calls, during presentations, and other forms of communications.

47.     Along with that press release, Sherwin-Williams began using a sell sheet for FX9502 that likewise promoted the cost and time savings due to the lower thicknesses (examples in **Figure 7**):[4]

## Figure 7



**Application Time Savings**
- Reduces time spent coating assets to accelerate applications
- Quick overcoating times
- Excellent sag resistance and a high-film build with minimal finishing requirements
- Fully mesh-free fire protection
- Requires only two coats for up to 120 minutes of protection



**Cost Effectiveness**
- Reduces the total cost of the coating process with as few as two coats
- Mesh free with low dry film thickness requirements for a wide range of beams and columns
- Minimizes the transportation cost of materials after application as a result of the epoxy's low installation weight
- Application flexibility to be applied in shops, modular yards or onsite
- No topcoat required for internal environments

---

[4] Sherwin-Williams Protective & Marine, *FIRETEX® FX9502 Sell Sheet* (2021), https://industrial.sherwin-williams.com/content/dam/pcg/sherwin-williams/protective-marine/na/us/en-us/pdfs/marketing-uploads/FIRETEX-FX9502-Sell-Sheet-Sherwin-Williams.pdf.

48.     In a YouTube video released on the same day,[5] the *first reason* that Sherwin-Williams listed to differentiate FX9502 was "Best-in-Class Dry Film Thickness Requirements."

49.     Also on the same day as its press release, Sherwin-Williams posted a substantially similar article as its press release on *Industrial Fire World*, an industry website,[6] that touted, among other things, that "FX9502 requires a lower dry film thickness (DFT) and is easier to apply compared to competitive epoxy fireproofing coatings – providing time, labor and cost savings to applicators and building owners alike."

50.     In a case study from 2023,[7] Sherwin-Williams emphasized that FX9502 provided major cost advantages by reducing both material and labor needs.  It stated that "the intumescent product, Firetex FX9502 from Sherwin-Williams Protective & Marine, required lower installed thicknesses compared to other coatings – helping designers showcase the steel's attractiveness – with faster application and curing times, plus significantly lower costs."  It further highlighted that "when using Firetex FX9502, the coating build required for the two hours of fire protection specified for 303 Battery ranged from 43 mils to 225 mils DFT."  Sherwin-Williams explained that this efficiency allowed applicators to "apply fewer coats of Firetex FX9502, and the steel moved through the shop faster – also translating to lower labor costs."  The company positioned these results as evidence that FX9502 provides a more economical and efficient solution for cost-

---

[5] Sherwin-Williams Protective & Marine, *FIRETEX® FX9502 Intumescent Fire Protection Application Video* (Oct. 26, 2021), YouTube, https://www.youtube.com/watch?v=NbLznWpfV3g.

[6] Industrial Fire World, *FIRETEX® FX9502 Epoxy Intumescent Coating* (2021), https://www.industrialfireworld.com/608585/firetex-fx9502-epoxy-intumescent-coating.

[7] Sherwin-Williams, *Case Study: 303 Battery Building Offsite Steel Fireproof Coating* (2023), https://industrial.sherwin-williams.com/na/us/en/protective-marine/media-center/case-studies/303-battery-building-offsite-steel-fireproof-coating.html.

conscious construction projects.

51.    Sherwin-Williams' advertising was effective.  Others in the industry mirrored Sherwin-Williams by *also* repeatedly highlighting the significant cost advantages in using FX9502.

52.    For example, on May 27, 2021 (the day after release),[8] journalist David Savastano of *Ink World Magazine* highlighted the product's cost and time advantages compared to competing intumescent coatings.  He explained that FX9502 "delivers efficiencies" and "can save hours, labor and costs through a combination of low application thicknesses, reduced coats and exceptionally fast drying times."  And he differentiated FX9502 because of its "lower dry film thickness (DFT)," which made it "easier to apply compared to competitive epoxy fireproofing coatings."  He again repeated later in the article that "FX9502 offers some of the lowest competitive thicknesses in the ASTM E119 designs for fire ratings up to three hours" which "contribute[s] to time, labor and cost savings."

53.    In an article published on June 3, 2021,[9] industry magazine *Paint & Coatings Industry* wrote in an article that FX9502 offered "an array of efficiencies."  It highlighted that using FX9502: "save[s] hours, labor and costs"; "requires a lower dry film thickness (DFT) and is easier to apply compared to competitive epoxy fireproofing coatings"; "offers some of the lowest competitive thicknesses in the ASTM E119 designs for fire ratings up to three hours"; and enables

---

[8] Coatings World, *New Sherwin-Williams Cellulosic Fireproofing Coating Delivers Efficiencies* (May 27, 2021), https://www.coatingsworld.com/breaking-news/new-sherwin-williams-cellulosic-fireproofing-coating-delivers-efficiencies/#:~:text=New%20Sherwin,Delivers%20Efficiencies.

[9] Sherwin-Williams Protective & Marine, *Cellulosic Fireproofing Coating from Sherwin-Williams Protective & Marine* (June 3, 2021), PCI Mag., https://www.pcimag.com/articles/108832-cellulosic-fireproofing-coating-from-sherwin-williams-protective-marine

"[t]he coating [to] be applied at a lower thickness than competitive epoxy intumescents, reducing material and associated labor costs."

54.     On its webpage published on August 6, 2021,[10] *Modern Steel Construction* highlighted FX9502 as a "New Product[]" and linked to the Sherwin-Williams website.  It touted the "array of efficiencies" in using FX9502 and highlighted "some of the lowest competitive thicknesses in the ASTM E119 designs for fire ratings up to three hours."  It repeated these characteristics of FX9502 in a pamphlet dated September 2021.[11]

55.     In an article published in *Materials Performance Magazine* in August 2021,[12] the journal highlighted FX9502's "array of efficiencies when applying long-term corrosion and fire protection to structural steel for buildings."  It emphasized that those using FX9502 "can save hours, labor, and costs through a combination of low-application thickness, reduced costs, and exceptionally fast drying times."  It also repeated Sherwin-Williams' claim that "the solution requires a lower dry film thickness and is easier to apply compared to competitive epoxy fireproofing coatings" and "offers some of the lowest competitive thickness" in the industry.

56.     In a post published on November 3, 2021,[13] industry magazine *Buildings* repeated Sherwin-Williams' claim that FX9502 "[r]equires a lower dry film thickness and is easier to apply

---

[10] Modern Steel Construction, *Product Showcase: FIRETEX® FX9502 Materials Performance Magazine* (Aug. 6, 2021), https://lsc-pagepro.mydigitalpublication.com/publication/?i=716956&article_id=4088584&view=articleBrowser.

[11] American Institute of Steel Construction, *Modern Steel Construction* (Sept. 2021), https://www.aisc.org/globalassets/modern-steel/archives/2021/september2021.pdf

[12] *Product Showcase: FIRETEX® FX9502 Materials Performance Magazine* (Aug. 2021), https://ampp.mydigitalpublication.com/publication/?i=715990&article_id=4083166&view=articleBrowser.

[13] Buildings Magazine, *Sherwin-Williams FIRETEX® FX9502* (Nov. 3, 2021), https://www.buildings.com/products/product/10202195/sherwin-williams-firetex-fx9502

compared to other epoxy fireproofing coatings."

57.     In an article announcing Sherwin-Williams' participation in the Advanced Manufacturing Facility Construction conference in Nashville, Tennessee, in 2023,[14] media company International Fire Buyer highlighted that: "FIRETEX 9502 offers high film build per coat properties, which allows applicators to achieve substantial coating thickness (200 mils) in a single layer."

58.     In a July 2023 article for the American Institute of Architects (AIA) network blog,[15] the article discussed a case study of Seattle's 303 Battery apartment complex.  It noted that the "developer discovered a fireproofing coating that matched its construction method's emphasis on speed, economy and environmental friendliness."  And, specifically, it highlighted the fact that FX9502 "required lower installed thicknesses compared to other coatings, helping designers showcase the steel's attractiveness."

59.     In an article published on November 1, 2024, *Industrial Paint and Protection Magazine* identified its recommended "Top Picks for 2025" for "Intumescent Paint" and noted that it "may receive a commission for affiliate links."  It then linked to the FX9502 sell sheet and highlighted that it "[r]educes total cost by requiring fewer coats and a low dry film thickness."[16]

60.     In a pamphlet released by the American Institute of Steel Construction dated March

---

[14] International Fire Buyer, *Sherwin-Williams Fireproofing at AMFC Conference* (Oct. 5, 2023), https://firebuyer.com/sherwin-williams-fireproofing-at-amfc-conference/

[15] Alison Karfeld**,** *From Thermal Protection and Fireproofing to Low-VOC Finishes: Coatings Elevate Sustainability of Three Multifamily Projects by Sherwin-Williams* (July 10, 2023), AIA Architect, https://network.aia.org/blogs/alison-karfeld1/2023/07/10/from-thermal-protection-and-fireproofing-to-low-vo.

[16] IPP Magazine, *Best Intumescent Paint and Coatings* (Nov 1, 2024), https://www.ippmagazine.com/fireproof-paint/intumescent-paint-and-coatings/#:~:text=,Chemical%20and%20corrosion%20resistant.

2025 but highlighting a Sherwin-Williams advertisement from 2024,[17] Sherwin-Williams continued to market that FX9502 "requires minimal application coats and drying times, getting the steel out of the shop and installed faster than ever."

**D.    Carboline Loses Sales and Substantial Market Share to FX9502**

61.    For construction projects operating on tight budgets and schedules, the substantially lower coating thickness translated directly into significant savings in both application labor and total project costs.  Developers and contractors recognized that the reduced thickness allowed lighter loads and simpler installation logistics.  These economic advantages quickly made FX9502 the preferred solution, enabling Sherwin-Williams to gain market share after 2021 and establish itself as the dominant supplier in this intumescent fireproofing segment.

62.    As FX9502 rose, market share of Carboline's Thermo-Lag E100 dramatically fell. The two products were in head-to-head competition for numerous projects throughout the United States.  But by making Thermo-Lag E100 appear needlessly labor-intensive and expensive by comparison, Sherwin-Williams diverted business away from Carboline and undercut Thermo-Lag's market position.

63.    In the past, Carboline was able to market Thermo-Lag E100 by focusing on its advantages over competitors.  For example, unlike Thermo-Lag E100, FX9502 exhibits brittle behavior, making it prone to fracture strains, which leads to unquantifiable repairs post erection (as shown in **Figure 8**):

---

[17] American Institute of Steel Construction, *Modern Steel Construction* (Mar. 2025), https://www.aisc.org/globalassets/modern-steel/archives/2025/march2025.pdf.

**Figure 8**



64.     But because of the low published thicknesses of FX9502, customers were willing to overlook these advantages for substantial time and cost savings.  Projects that might have used Carboline's fireproofing instead switched to FX9502 based on Sherwin-Williams' misrepresentations.  As a direct result, Carboline lost sales and market opportunities.  Customers chose the allegedly cheaper FX9502 thinking they could significantly cut costs without sacrificing safety.  Carboline's reputation has also suffered because Thermo-Lag E100 was unfairly cast as an inferior, less efficient product.

65.     The damage to Carboline is tangible.  The company directly lost hundreds of millions of dollars in sales since FX9502's introduction in 2021, correlating with Sherwin-Williams' marketing campaign that touted FX9502's cost savings.  Effectively eliminated as a choice for construction projects, Thermo-Lag E100's market share collapsed.

66.     In short, FX9502's appeal to budget-minded developers was built on misinformation, and Carboline has been materially harmed through lost revenue, eroded customer goodwill, and the distortion of fair competition in the fireproofing market.

**E.     Sherwin-Williams' Advertising of FX9502 Was False and Material**

67.     In 2024, Sherwin-Williams unexpectedly released *new results* for the required

thickness testing for FX9502 from Intertek.[18]  Retesting is not common, and so it is unclear why Sherwin-Williams and/or Intertek decided to retest FX9502.

68.    The results were shocking.  As the below **Figure 9** shows, the new results for FX9502 demonstrated construction customers needed *far more* thickness to achieve sufficient fire protection for 2 hours for restrained beams (the most common use) than Sherwin-Williams had promised for years:

**<u>Figure 9</u>**

| Hp/A | 2021 Results (in.) | 2024 Results (in.) | Percent Change |
|---|---|---|---|
| 70 | .043 | .113 | **163%** |
| 100 | .054 | .127 | **135%** |
| 150 | .071 | .159 | **124%** |
| 200 | .089 | .190 | **113%** |
| 300 | .125 | .253 | **102%** |

69.    The new results showed that Sherwin-Williams' bold claims about FX9502 were false.  In reality, the dramatic efficiency promises it made were not supported by reliable fire-test results, rendering Sherwin-Williams' statements about the required thicknesses (and the related cost and time savings) literally false.

70.    Indeed, Sherwin-Williams has essentially *admitted* the falsity and materiality of the 2021 Intertek results in its SEC disclosure:[19]

In July 2024, a third-party assurance, testing, inspection and certification provider changed its listing for one of the Company's protective coatings products, an intumescent coating used for fire protection of steel beam assemblies. The Company has received claims regarding this matter, including from a competitor, and is working with its customers and

---

[18] *See* Exhibit C (2024 Intertek Results for FX9502).

[19]    The Sherwin-Williams Co., Quarterly Report (Form 10-Q) (July 26, 2025), https://www.sec.gov/ix?doc=/Archives/edgar/data/0000089800/000008980025000115/shw-20250630.htm

end users to assist in understanding the potential impacts of the listing change, including the extent of potential remedial action that may involve the application of additional product. The Company is also investigating potential inaccuracies for certain other Firetex intumescent products arising out of tests conducted on those products by the same third-party provider. Additionally, the Company is investigating an issue in connection with its Firetex Design Estimator software in which the software recommended estimated dry film thicknesses (DFT) for certain intumescent products that were in excess of published maximum DFTs, for which the Company has also received claims. The Company's review of these matters is ongoing. Except for an immaterial product warranty liability which remains recorded on the Consolidated Balance Sheets as of June 30, 2025, any additional amount or range of potential loss cannot be reasonably estimated at this time.

71.     Sherwin-Williams claims that it was effectively an innocent bystander and had *no idea* (nor could have had any idea) that it was falsely marketing the FX9502 to its significant commercial advantage.  Upon information and belief, that claim is false.

72.     Prior to releasing FX9502, Sherwin-Williams had released FX9500, a two-component, durable epoxy intumescent fire-protection coating specifically designed for structural steel.  As discussed above, the 2021 Intertek results for FX9502 showed *far lower* required thicknesses than FX9500.  For that to be the case, Sherwin-Williams would have needed a substantial technological innovation with respect to its *own predecessor product* to achieve the far lower thicknesses.  But, as the 2024 results showed, there was no such technological innovation. And yet Sherwin-Williams accepted the false results without any internal verification or testing.

73.    The truth is that Sherwin-Williams knew, and certainly could have known, that the results were false and ignored that falsity because it had a huge advantage in the marketplace. Indeed, the 2024 Intertek testing for FX9502 shows that there was no substantial technological innovation in terms of thickness.  As shown in **Figure 10** below, the 2024 FX9502 thicknesses *mirror* the FX9500 thicknesses:

**<u>Figure 10</u>**



74.     Moreover, in 2021, Intertek issued results for *both* unrestrained *and* restrained beams.  As shown below in **Figure 11** based on a competing product, thicknesses for the same product as applied to unrestrained beams and restrained beams are generally close:

**Figure 11**



75.    But based on the 2021 Intertek results for FX9502, as shown by **Figure 12** below, the thickness differences between the two were substantial.  This, again, should have caused any reasonable Sherwin-Williams employee to raise questions since there was no substantial technological development that would explain this result:

<u>**Figure 12**</u>



76.    Indeed, as **Figure 13** below shows, the thickness requirements for unrestrained and restrained beams based on the 2024 Intertek were very similar, as is expected in the industry:

**<u>Figure 13</u>**



77.    Sherwin-Williams employs many people who have expertise in this industry and with these products.  Based on the above facts and upon information and belief, it is highly improbable that *no one* knew or suspected that the 2021 Intertek results were wrong.  This assertion lacks credibility.  And regardless, intent is not an element of liability under the Lanham Act.

F.    **<u>Now Able to Compete, Carboline Slowly Begins to Regain Market Share</u>**

78.    Once the truth about FX9502's false efficiency claims came to light, the market began to shift.  Sherwin-Williams could no longer credibly market FX9502 as a materially cheaper, faster option.  Contractors and developers, who had relied heavily on promises of savings, began

realizing they had been misled.  And the correction removed the illusion of a breakthrough product and allowed for a re-leveling of the playing field.

79.     Thermo-Lag E100 was once again able to compete.  Customers can once again see Carboline's Thermo-Lag E100 for what it always was: a proven, reliable solution backed by accurate testing and performance data.  On the other hand, Sherwin-Williams' FX9502's cracking problems could no longer be ignored in favor of significant cost savings.

80.     With the false cost advantage eliminated, Carboline has already begun to regain lost market share.  Some developers and contractors who were swayed to FX9502 because of supposed savings have returned to Thermo-Lag E100, valuing its proven safety record and dependable performance.  Carboline has been winning projects, though its recovery has been gradual because rebuilding customer trust and undoing the years of market distortion takes time.

81.     Nevertheless, Carboline has started to reclaim its position as the preferred choice for intumescent fireproofing.  This rebound underscores that Sherwin-Williams' market success was not built on product superiority, but on false claims.  And once those claims were exposed, Carboline's product strength and reputation naturally reasserted themselves.

G.     **Sherwin-Williams Chooses to Blame the Victim Rather than Take Full Responsibility**

82.     Carboline did not rush into litigation.  Before bringing this lawsuit, Carboline reached out to Sherwin-Williams directly in good faith, seeking to resolve this dispute without the need for court intervention.  Carboline made clear in its correspondence that it wished to discuss a business resolution that compensated Carboline for the harm the false advertising had inflicted on its business.

83.     Rather than take responsibility for its own false claims, Sherwin-Williams chose to

go on the attack.  In response to Carboline's outreach, Sherwin-Williams threatened that if Carboline pursued its claims, Sherwin-Williams could retaliate by attempting to identify and raise an issue with Carboline's advertising.  This threat marked a stark refusal to engage with the substance of Carboline's allegations and instead was aimed to distract from the serious issue facing Sherwin-Williams and to coerce one of the victims of Sherwin-Williams' wrongdoing (Carboline).

84.     Sherwin-Williams' threat is baseless.  Unlike Sherwin-Williams' reckless rollout of FX9502 without any appropriate level of internal verification or testing, Carboline's Thermo-Lag E100 has been properly tested in accordance with industry standards, verified (both internally and by third parties), and on the market for nearly a decade.  If Sherwin-Williams truly believed there were any issues with this material or how it was being advertised, it certainly would have raised them sometime over the *many years* prior to Carboline's recent outreach regarding the devastating effect of Sherwin-Williams' false advertising on its business and request for fair compensation.

85.     Sherwin-Williams' threat is a transparent litigation tactic, raised for the first time only after Carboline—a much smaller organization—made its demand.  And it is plainly intended to create leverage rather than to vindicate any genuine grievance.  Unfortunately, because Sherwin-Williams has refused to take responsibility for its false advertising and instead has sought to intimidate it, Carboline has no choice but to bring this action.

## LEGAL CLAIM

### Violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)

86.     Carboline incorporates all other allegations in this complaint.

87.     Sherwin-Williams has made literally false statements of fact to customers about its FX9502 product by, as discussed in this Complaint, disseminating the false 2021 Intertek results

to customers as part of its marketing and promotion of FX9502.  And it likewise marketed the cost and time savings of FX9502 through false and misleading advertising statements based on the false Intertek results by claiming that by using FX9502, customers: (i) would "save hours, labor and costs through a combination of low application thicknesses, reduced coats and exceptionally fast drying times"; and (ii) would be able to use "coating [that] can be applied at a lower thickness than competitive epoxy intumescents, reducing material and associated labor costs."

88.     Sherwin-Williams' statements, even if not literally false, are likely to mislead, confuse, or deceive consumers because they promised *far lower thickness requirements* than Carboline's competing products.  As discussed above, this misled customers into believing that using FX9502 would result in far lower costs and time than using Carboline's products.

89.     Sherwin-Williams' false and misleading statements have deceived a substantial segment of the construction customers looking for epoxy intumescent coatings.  As discussed above, Carboline could not compete because customers believed that FX9502 offered such lower costs and time that the other advantages of Carboline's products were irrelevant.  Now that the truth has been revealed, Carboline can once again compete, showing that the prior false and misleading statements were material.

90.     Because Sherwin-Williams sold FX9502 throughout the United States, it used the false and misleading statements in interstate commerce.

91.     Carboline directly competes with Sherwin-Williams in the market to sell epoxy intumescent coating products.  As discussed above, Sherwin-Williams' false and misleading statements resulted in injury and harm to Carboline, including lost sales, lost market share, and reputational harm.

92.     As shown above, many of Sherwin-Williams' false statements are still available

online, as are the 2021 Intertek results.  It is also likely that there are customers who still believe that the 2021 Intertek results were accurate.  Accordingly, Carboline is entitled to injunctive relief to remove all prior false statements and for a corrective statement that will hopefully help remove any remaining deception.

93.    Finally, Carboline is entitled to up to three times its actual damages, an award of Sherwin-Williams' ill-gotten profits, as well as costs and reasonable attorneys fees under 15 U.S.C. §§ 1116–17.

## PRAYER FOR RELIEF

WHEREFORE, Carboline prays for judgment as follows: (a) a judgment in favor of Carboline and against Sherwin-Williams; (b) a permanent injunction ordering Sherwin-Williams to remove all false and misleading advertising; (c) a permanent injunction requiring sufficient corrective advertising by Sherwin-Williams; (d) a declaration that this is an "exceptional case" due to the willful nature of Sherwin-Williams' unlawful conduct; (e) an award of damages, fees, and costs to Carboline under 15 U.S.C. § 1117, and any other damages (including treble damages, disgorgement, and attorney's fees) to the full extent allowable under the law; (f) an award of pre-judgment interest on the amount of any judgment in favor of Carboline; (g) any other equitable relief necessary to prevent and remedy Sherwin-Williams' unlawful conduct; and (h) such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Carboline demands a jury trial as to all claims and issues so triable.

- 33 -

Dated: September 2, 2025                Respectfully submitted,


By:    /s/Cathleen Aubuchon
       Cathleen Aubuchon

       **SHOOK, HARDY & BACON, L.L.P.**
       Charles Eblen, 55166 (MO)
       2555 Grand Blvd.
       Kansas City, MO 64108
       Tel: (816) 474-6550
       Fax: (816) 421-5547
       Email: ceblen@shb.com

       Cathleen Aubuchon, 69946 (MO)
       190 Carondelet Plaza, Suite 1350
       St. Louis, MO 63105
       Tel: (314) 690-0200
       Fax: (314) 690-0249
       Email: caubuchon@shb.com

       John C. Hueston (*pro hac application
       forthcoming*)
       Sourabh Mishra (*pro hac application
       forthcoming*)
       **Hueston Hennigan LLP**
       620 Newport Center Drive
       Newport Beach, CA 92660
       Tel: (949) 356-5536
       Fax: (888) 775-0898
       Email: jhueston@hueston.com
       Email: smishra@hueston.com

       *Counsel for Plaintiff*